UNITED STATES, Appellee

v

JUDSON C. CROSS, Airman Third Class, U. S. Air Force, Appellant

14 USCMA 660, 34 CMR 440

Lieutenant Colonel James W. Logan argued the cause for Appellant, Accused. With him on the brief was Colonel Daniel E. Henderson, Jr.

Major Neil Kasdan argued the cause for Appellee, United States. With him on the brief was Colonel Emanuel Lewis.

## Opinion of the Court

QUINN, Chief Judge:

A special court-martial at Goose Air Base, Labrador, convicted the accused of disrespect toward a superior officer, failure to obey an order, and wilful damage to a picture window in a noncommissioned officers' open mess, in violation of Articles 89, 92, and 108, respectively, Uniform Code of Military Justice, 10 USC §§ 889, 892, and 908. It sentenced him to a bad-conduct discharge, reduction in grade, confinement at hard labor for four months, and partial forfeiture of pay for the same period. Intermediate appellate authorities affirmed. We granted review to consider the accused's contention that a pretrial statement by him was improperly admitted into evidence.

At trial, no objection was made to the admission of the accused's statement. The failure to object often results in an incomplete picture of the essential facts. For example, evidence to overcome the basis for a particular objection is not presented; or steps that could be taken to guard against the court-martial's consideration of inadmissible evidence are not initiated. See United States v Diterlizzi, 8 USCMA 334, 24 CMR 144; United States v Dupree, 1 USCMA 665, 5 CMR 93. Consequently, unless the record of trial indicates a manifest injustice would result from the failure to review the issue, this Court, with other Federal appellate courts, has not been willing to overturn an otherwise proper conviction, on the ground that evidence admitted without objection by the accused should not have been used against him. United States v Dial, 9 USCMA 700, 26 CMR 480; United States v Fisher, 4 USCMA 152, 15 CMR 152. True, because of the limitations of defense counsel in a special court-martial, we have sometimes relaxed the rule. Here, defense counsel was qualified within the meaning of Article 27(b) of the Uniform Code, 10 USC § 827; and the record of trial contains testimony by an eyewitness to the offense to which the pretrial statement in issue relates. In this case, therefore, no reason appears to disregard the general rule of waiver. United States v Dial, supra, at pages 704, 705. It is, however, argued that the evidence of record shows a flagrant violation of Article 31, Uniform Code of Military Justice, 10 USC § 831, and requires reversal of the conviction, in the interest of justice, without regard to the absence of objection or the other evidence of guilt. See United States v Webb, 10 USCMA 422, 27 CMR 496. We disagree with the construction of the evidence upon which the argument is based. Since elaboration of our disagreement necessitates the same kind of review as consideration of the accused's assignment of error, we think it appropriate to deal with the merits.

Airmen of less than noncommissioned rank were ordinarily not permitted to use the facilities of the American Noncommissioned Officers' Mess at Cartwright Air Station, Labrador. However, on "certain nights" they were permitted entry. July 4th was such a night. Airman First Class Hugh W. Parsons was seated with the accused and Airman Havis at a table in the Mess. They were drinking beer. "[S]uddenly," the accused picked up

a bottle and threw it at a thermopane picture window about ten feet away. He "mumbled something" about wanting "to break the window." Master Sergeant Gene B. Derrickson, the Mess Secretary-Custodian, heard the crash. The bartender told him that "somebody from this table had thrown a bottle against the window." He approached the group at the accused's table "to investigate." His testimony continues as follows:

"Q. Did you make an inquiry of any individual seated at the table with Airman Cross?

"A. Yes, sir, I asked Airman Havis if he had thrown the bottle against the window and he said no. Then I went to Airman Parsons and asked him and he said Airman Cross had thrown the bottle, then I asked Airman Cross and he said yes.

"Q. What did you do then?

"A. I asked Airman Cross to leave the Club at that time.

"Q. Did he?

"A. No, sir.

"Q. What did you do next?

"A. I repeated it again, to leave the Club and he said no and so then I called the OD.

"Q. Did the OD come to the Club?

"A. Yes, sir.

"Q. Did Airman Cross depart from the Club?

"A. Yes, sir."

Captain James W. Dove of the accused's squadron was the Officer of the Day. On receiving Sergeant Derrickson's telephone call, he went to the Mess. He proceeded directly to the accused's table and "asked . . . [him] to leave the NCO Club." The accused did. In the hall outside the Club rooms, Captain Dove told the accused to go to his quarters. The accused walked away in the opposite direction. Thereupon, Captain Dove ordered him "to go to his room and remain there for the remainder of the evening." The accused went toward his room. But, about an hour later, he was seen in the Airmen's Club. He was called out by Captain Dove. In the conversation that followed, he uttered the obscene words which led to the charge of disrespect toward a superior officer. At trial, the accused testified, in substance, that to celebrate the July 4th holiday he imbibed "a case or more" of free beer at the Airmen's Club. He remembered practically nothing of his activities after he left that Club. He "believe[d]" he later sat at the table in the Noncommissioned Officers' Mess with Airman Havis, but he could not remember if Parsons was present. He could not recall "throwing the bottle" at the window, although it was "possible" he had done so. He also maintained he had no recollection of any conversations with Captain Dove, except for a "brief idea" that he talked to him in the hallway outside the Mess.

Appellate defense counsel contend it was error to admit into evidence the accused's response to Sergeant Derrickson's question, because he was not first advised of his rights under Article 31. The board of review considered the contention. It concluded Derrickson was not engaged in any action connected with law enforcement and was not required to advise the accused preliminarily of his rights under the Article. See United States v Caliendo, 13 USCMA 405, 32 CMR 405; cf. United States v Nowling, 9 USCMA 100, 25 CMR 362. Had the issue been raised at trial by proper objection, and submitted to the court-martial by appropriate instructions, our review would be limited to whether there was evidence to justify submission of the issue to the fact finders. United States v Acfalle, 12 USCMA 465, 469, 31 CMR 51; United States v Dandaneau, 5 USCMA 462, 18 CMR 86. Whether we should use the same test to review the correctness of the board of review's determination of an issue raised for the first time before it, need not detain us. We are satisfied that, in the situation presented by the record of trial, Sergeant Derrickson was not required to preface the question he addressed to the accused with preliminary advice as to the provisions of Article 31.

The Secretary-Custodian of a mess

is, in effect, its general manager. AFM 176–3, Open Mess Cost ▮▮▮▮ Control and Management Manual, February 23, 1962. His responsibilities are defined by regulations. These do not specifically list the duty to maintain order and decorum among the members and guests, but that responsibility is plainly inherent in the office. AFR 176–11, paragraph 14, December 6, 1962. It unmistakably appears from the evidence that, in approaching the accused's table, Sergeant Derrickson was acting in his capacity as a mess official and for a mess purpose. In other words, he addressed the accused as Custodian of the Mess, not as a superior noncommissioned officer purporting to exercise disciplinary authority over him. See United States v Grant, 10 USCMA 585, 28 CMR 151; United States v Dodge, 14 USCMA 440, 34 CMR 220. Nor did he act as a law enforcement official engaged in gathering evidence for prosecution of a crime. United States v Souder, 11 USCMA 59, 61, 28 CMR 283; United States v Baker, 11 USCMA 313, 29 CMR 129; see also United States v Malumphy, 13 USCMA 60, 32 CMR 60. As appellate Government counsel ably argued in their brief, and at the hearing, Derrickson's actions in talking to the accused illumine his status and his purpose with unusual clarity. He did not seek to implicate everyone at the table, but confined himself to ascertaining the person who actually threw the bottle; he did not inquire into the reasons or the circumstances for the act, but merely asked the accused, who had been permitted to enter the Club as a special guest, to leave. When the accused refused to go, Derrickson did not order him out, as a noncommissioned officer exercising disciplinary authority over him would have done; nor did he call the Air Police for help, as a law enforcement agent seeking assistance would have done. He called the Officer of the Day. And he merely asked him, as Captain Dove testified, "to have Airman Cross leave the NCO Club." He made no accusation of criminal conduct against the accused; and he placed no such charge against him.[1] In sum, the evidence demonstrates that Derrickson, acting only as a mess manager engaged in the ordinary discharge of his responsibility, sought to ascertain the identity of a disorderly guest for the sole purpose of requesting him to leave the Club. Under the circumstances, he was not required to refer to the provisions of Article 31, as a preliminary to his inquiry. See United States v Malumphy, 12 USCMA 639, 31 CMR 225; United States v Hopkins, 7 USCMA 519, 22 CMR 309; United States v Meyers, 15 CMR 745.

The decision of the board of review is affirmed.

Judge KILDAY concurs.

FERGUSON, Judge (dissenting):

I dissent.

With due respect to the views of my brothers, I am certain they err in concluding that Master Sergeant Derrickson was not required, under Uniform Code of Military Justice, Article 31, 10 USC § 831, to advise the accused of his rights prior to ascertaining whether he had broken the window in the Noncommissioned Officers' Mess and that, in consequence, it was proper to receive the inquiry and the reply thereto in evidence against the accused. To the contrary, I believe the evidence establishes a plain violation of the statute and receipt of the statement in evidence was prejudicially erroneous.

In a long line of opinions, broken only by such ad hoc departures as this, we have laid down the rigid requirement that one subject to the Code, who suspects another person subject to the Code of committing an offense, must, prior to interrogating him, inform him of the nature of the allegation; advise him that he need not make any statement; and that any statement he does make may be used against him in a trial by court-martial. United States v Wilson, 2 USCMA 248, 8 CMR 48;

---

[1] The record of trial suggests that if the accused had not later disobeyed Captain Dove's order, and had not been disrespectful to him, no criminal proceedings would have been had on the bottle throwing incident.

663

United States v Souder, 11 USCMA 59, 28 CMR 283; United States v Gorko, 12 USCMA 624, 31 CMR 210; United States v King, 14 USCMA 227, 34 CMR 7; United States v Murphy, 14 USCMA 535, 34 CMR 315. Under the law of the Court, there need only be some element of officiality connected with the questioning in order for the duty to warn to come into play. United States v Souder, supra; United States v Gibson, 3 USCMA 746, 14 CMR 164; United States v Murphy, supra; cf. Massiah v United States, — US —, 12 L ed 2d 246, 84 S Ct 1199 (1964). The last-mentioned matter is the only real question before us and, in my view, there is not the slightest doubt that Master Sergeant Derrickson was acting in the line of duty.

There is no contest in the facts surrounding the issue. As the Chief Judge points out, Derrickson, the Mess Secretary-Custodian, heard the crash of glass as the window was broken. He was informed by the bartender that the missile causing the damage came from the accused's table. Derrickson approached the table to investigate the matter. He was told by Airman Parsons that the accused had thrown the bottle and thereafter "asked Airman Cross and he said yes." Concededly, no warning under Code, supra, Article 31, was interposed. Regardless of what thereafter transpired or what other offenses accused may have later committed, insofar as the issue here presented is concerned, these are the operative facts.

A noncommissioned officers' mess such as the one involved here is a nonappropriated fund of the United States. And, as has been succinctly noted:

". . . Certain characteristics are common to all nonappropriated fund activities, foremost among which is the fact that they are instrumentalities of the Federal Government and are entitled to all the privileges and immunities ordinarily accorded such instrumentalities.

"*These activities are operated as command functions, and are supervised by officers or employees of the Government acting in their official capacity.*" [Emphasis supplied.] [Department of the Army Pamphlet 27–187, Military Affairs, May 1963, paragraph 14.3.]

See also Standard Oil Company v Johnson, 316 US 481, 86 L ed 1611, 62 S Ct 1168 (1942). Edelstein v South Post Officers Club, 118 F Supp 40 (ED Va) (1951), and United States v Holcombe, 277 F2d 143 (CA 4th Cir) (1960), the latter characterizing "An Officers' Mess . . . [as] an integral part of the military establishment, and an agency of the Government according to the usual meaning of the word."

Thus, Master Sergeant Derrickson was the full-time supervisor of an official instrumentality of the Government and a person acting in an official capacity when performing his duties in connection therewith. Indeed, the Secretary is appointed by the commander involved and his sole *military* duty consists of operating the Mess under the supervision of the Board of Governors. Air Force Regulations 176–11, paragraph 14. And, as the principal opinion states, "the duty to maintain order and decorum . . . is plainly inherent in the office." It cannot be gainsaid, therefore, that in all respects, Master Sergeant Derrickson was acting in the capacity of his Federal position and in the execution of his command assigned responsibilities when he approached accused's table and conducted his inquiries. As such, it should be clear beyond cavil that he was "officially" questioning Airman Cross, whom he suspected as the guilty party.

In United States v Souder, supra, the accused entered a music store operated by a Lieutenant Gallagher in a purely private capacity, although he was also a naval officer on active duty. He offered an accordion for sale which fitted the description of a stolen instrument concerning which Gallagher had been previously advised by security personnel.

Gallagher, in the course of haggling over the price to be paid for the instrument and suspecting accused of hav-

ing stolen it, obtained from him an admission that he had gotten it " 'in a certain way' " aboard ship and that it belonged to him. This Court unanimously set aside the findings of guilty, when such statements by the accused were received in evidence and it was established Gallagher had not warned him of his rights pursuant to Code, supra, Article 31. The principal opinion declared, at page 61:

"Whether viewed from the standpoint of the accused or that of his interrogator, it is obvious that Lieutenant Gallagher was under a duty to advise both sailors of their rights under Code, supra, Article 31, prior to questioning them concerning the stolen musical instrument. He was a 'person subject to this chapter' interrogating an individual whom he 'suspected of an offense.' In fact, it is patent from his testimony, quoted supra, that Lieutenant Gallagher conversed with the accused and his companion for the express purpose of obtaining incriminating admissions from them."

The Chief Judge, concurring separately, stated, at page 61:

". . . The record of trial in this case shows that Lieutenant Gallagher suspected the accused of a specific offense and interrogated them for the sole purpose of obtaining incriminating admissions. In my opinion, his action falls within the purview of Article 31 and made the accused's statement inadmissible in evidence because obtained in violation of the Article."

Only the separate opinion of Judge Latimer, who also found the naval officer to be conducting a criminal investigation, sought narrowly to limit the warning requirement of the Article to those parties occupying some position in connection with law enforcement. But compare Massiah v United States, supra.

In United States v Gorko, supra, the Court, over the Chief Judge's dissent, similarly held it was the duty of accused's guard flight commander to advise him of his rights under Code,

supra, Article 31, before asking Gorko to relate the circumstances surrounding the shooting of a fellow guard which had been reported to the commander. Under the evidence presented, it held an issue of fact raised on the question whether the commander had suspected accused at the time of his inquiry and concluded it was prejudicially erroneous for the law officer not to have submitted such to the court members under proper instructions.

More recently, in United States v Murphy, supra, we struck down accused's conviction when it appeared that his enlisted supervisor had participated in a civilian investigation of certain allegedly forged checks and had questioned Murphy without interposition of the necessary warning. Of particular interest is our comment, at page 539:

". . . But Sergeant Rider also participated in the interview, urged the accused to confess, and asked the 'one particular question' which resulted in a complete, albeit conclusory, admission of guilt. There is no doubt that Rider was a person 'subject to this chapter.' Moreover, he was accused's immediate enlisted supervisor, expressed interest as such in the allegations against him, and participated in the interview on that basis. *While he stated that he was not then acting on behalf of the Air Force, and it is apparent he was not a military detective, the warning requirement of the Article, i.e., officiality, is not so narrowly limited.* United States v Souder, 11 USCMA 59, 28 CMR 283; United States v Gibson, 3 USCMA 746, 14 CMR 164." [Emphasis supplied.]

To the same effect is United States v King, supra, wherein we reversed upon a showing that the investigator had interrogated accused on behalf of Texas civil authorities while suspecting him of a crime and without interposing the statutory warning.

These authorities point inevitably to the reversal of accused's conviction in the case before us. It is conceded it was Master Sergeant Derrickson's duty to preserve order and to maintain the Mess in proper condition. He is offi-

cially appointed for that purpose by the Commander concerned, and the Mess—as opposed to being a private club or restaurant—is an official arm of the United States, and "an integral part of the military establishment." United States v Holcombe, supra, at page 146. He was attempting to establish where the fault lay for breaking the window when he interrogated the accused. United States v Murphy, supra. And he suspected accused, for he had just been informed by another airman at the same table that Cross was the guilty party. Thus, in every sense of the word, Derrickson was acting in an official capacity and conducting an investigation when he obtained the incriminatory answer from accused. United States v Souder, supra. The Article demanded his interposition of the statutory warning.[1]

The principal opinion seeks to avoid this result by approaching the problem negatively. Thus, it declares that Derrickson "was acting in his capacity as a mess official and for a mess purpose." Such a consideration, however, overlooks the official character of the mess and full military duty connected with the position of Secretary-Custodian. United States v Holcombe, supra; Air Force Regulations 176–11, supra. Next, it relies upon the fact that Derrickson was not acting "as a law enforcement official engaged in gathering evidence for prosecution of a crime." But, as we pointed out in United States v Murphy, supra, the warning requirement of Code, supra, Article 31, is not so limited. Indeed, it is more than arguable that a superior noncommissioned officer specifically charged with maintenance of order and decorum in the Mess and appointed by the Commander, *inter alia,* for that purpose, is —in the military sense—a law enforcement official. Cf. United States v Kelley, 7 USCMA 584, 23 CMR 48, placing the duty to warn upon a Navy master-at-arms before interrogating a suspect.

Finally, it is pointed out that Derrickson called upon the Officer of the Day for assistance rather than turning to the Air Police. Again, however, the opinion misapprehends the nature of that functionary's duties, for he is in command of the guard and directly substitutes for the commanding officer during off-duty hours. In sum, the mentioned factors point not at all to the conclusion there was no duty here to warn accused of his rights. United States v Souder, supra; United States v Murphy, supra.

For the reasons stated, therefore, I would conclude that Code, supra, Article 31, was violated by the receipt in evidence of accused's unwarned statement. As we have previously noted, such a confession is the strongest evidence of guilt available, United States v Monge, 1 USCMA 95, 2 CMR 1, and, despite the lack of objection, I would not invoke the doctrine of waiver. The burden is on the Government affirmatively to establish voluntariness. United States v Odenweller, 13 USCMA 71, 32 CMR 71. On the face of the record, the violation is plainly established. Under such circumstances, the statement should have been excluded. United States v Kelley, supra, at page 588. It should always be borne in mind that, while in the military, accused is furnished with the services of an attorney, he has limited choice as to the identity of his representative. I am loath, therefore, to charge an accused with direct responsibility for failure to interpose objection to what should have been recognized by all as egregious error.

I would set aside the findings of guilty as to Charge III and its specification, and order reassessment of the sentence on the remaining findings of guilty.

---

[1] Indeed, it is worthy of note that the specific charge here involved, which alleges destruction of the window, characterizes it as "military property of the United States."